AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| | ) | Case No.   **23mr102** |
| 300 Moon Street SE, Trailer 3, Albuquerque, New Mexico 87123 | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ **New Mexico** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Distribution of and Possession with Intent to Distribute Controlled Substances Conspiracy |

The application is based on these facts:

See attached affidavit submitted by SA Kyle Coffey.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*SA Kyle Coffey*

*Applicant's signature*

Kyle Coffey, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___ Telephonically sworn and electronically signed ___ *(specify reliable electronic means)*.

Date: ___ 01/13/2023 ___

*John F. Robbenhaar*

*Judge's signature*

City and state: Albuquerque, New Mexico

John F. Robbenhaar, U.S. Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:

300 Moon Street SE, Trailer 3, Albuquerque,
New Mexico 87123

Case No. _____

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Kyle Coffey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the following premises known as 300 Moon

Street SE, Trailer 3, Albuquerque, New Mexico, 87123 ("PREMISES 1") further described in

Attachment A, for the things described in Attachment B.

2.      I am a Special Agent (SA) with the U.S. Drug Enforcement Administration

(DEA), and have been since May 2020.  I am assigned to the DEA's Albuquerque District

Office.  As a SA for the DEA, I am an investigative law enforcement officer of the United States

within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations

of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  As a SA with DEA, I retain

the powers of enforcement as set forth in 21 U.S.C. § 878.  Prior to my employment with the

DEA, I was employed as a police officer with the Virginia Beach Police Department for

approximately 4 years. Over the course of my career, I have accumulated the following training

and experience:

a.   I graduated from the DEA Academy in Quantico, Virginia, where I received

approximately 14 weeks of specialized drug-related training.  The training

included controlled substance identification, drug-related investigative techniques,

interview and interrogation training, preparation of search warrants, tactical

applications of drug enforcement, and surveillance and electronic monitoring

techniques.

b.   As a Police Officer and a DEA Special Agent, I have participated in

investigations of individuals and organizations trafficking heroin, cocaine,

cocaine base ("crack"), marijuana, methamphetamine, fentanyl and other

controlled substances as defined in 21 U.S.C. § 801.  My experience as a Special

Agent includes, but is not limited to, conducting surveillance, interviewing

witnesses, participating in arrests, searches, and seizures, drafting affidavits for

search warrants (to include warrants authorizing the collection of prospective cell

phone location information, or "ping" warrants like this one) and criminal

complaints, and working with informants.  I have participated in the investigation

of several drug trafficking conspiracies.  As a result, I am familiar with matters

including, but not limited to, the means and methods used by persons and drug

trafficking organizations (DTO) to purchase, transport, store, and distribute illegal

drugs and to hide profits generated from those transactions.

3.      I have been involved in an ongoing investigation regarding the distribution of

controlled substances, specifically methamphetamine, by several individuals, including an

individual, who agents believe to be Enrique Alonso CHAVEZ, who appears to reside in

PREMISES 1 (hereinafter the male agents believe to be CHAVEZ will be referred to as

CHAVEZ).  Since the investigation's inception, I, as well as other Special Agents and Task

Force Officers with DEA and law enforcement officials from other agencies have obtained

information regarding the illegal drug trafficking activities of CHAVEZ and this drug trafficking

organization (DTO).

4.      I make this affidavit based upon my own personal knowledge, which is

substantially derived from my participation in the investigation, as well as that of fellow agents

and officers who have participated in the investigation.  In addition, I have developed

information I believe to be reliable from additional sources including:

a.      Information provided by Task Force Officers ("TFO"), Special Agents

("SA"), and Intelligence Research Specialists (IRS) of the DEA, and other

law enforcement officials ("agents"), including oral and written reports

that I have received directly or indirectly from said investigators;

b.      Results of physical surveillance conducted by agents during the

investigation;

c.      A review of telephone toll records and subscriber information;

d.      Information derived from consensually recorded conversations;

e.      A review of driver's license and automobile registration records;

f.      Records from commercial and/or law enforcement databases; and

g.      Records from the National Crime Information Center ("NCIC").

5.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

6.      I believe there is probable cause that CHAVEZ has committed, is committing, and

will continue to commit offenses involving violations of, *inter alia*:

    a.  21 U.S.C. § 846: Conspiracy

    b.  21 U.S.C. §§ 841: Distribution of and Possession with Intent to Distribute
Controlled Substances.

## EVIDENCE SOUGHT DURING SEARCH

7.      Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

8.      Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

9.      Individuals involved in drug dealing commonly use certain paraphernalia to

package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

10.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

11.     Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

12.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

13.     Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

14.     Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash

earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

15.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace.  This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.  Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

16.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and

yards, the residences of friends or relatives, and vehicles.

17.    The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

18.    Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

19.    Drug traffickers often maintain firearms and ammunition on their person or in

their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

20.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

21.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

22.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize

9

surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

23.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

24.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

25.     A list of items agents seek authority to seize is in Attachment B.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.     As described above and in Attachment B, this application seeks permission to

search for evidence and records that might be found on the PREMISES, in whatever form they

are found.  Much of the evidence and records described in the paragraphs above, and in

Attachment B, can also be produced and/or stored on computers, digital media and other storage

media.  For this reason, I submit that if a computer, digital medium, or storage medium is found

on the PREMISES, there is probable cause to believe those records will be stored on that

computer or storage medium. Thus, the warrant applied for would authorize the seizure of

electronic storage media or, potentially, the copying of electronically stored information, all

under Rule 41(e)(2)(B).

27.     *Necessity of seizing or copying entire computers or storage media.*  In most cases,

a thorough search of a premises for information that might be stored on storage media often

requires the seizure of the physical storage media and later off-site review consistent with the

warrant. In lieu of removing storage media from the premises, it is sometimes possible to make

an image copy of storage media.  Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files.  Either

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded

on the storage media, and to prevent the loss of the data either from accidental or intentional

destruction.  This is true because of the following:

> a.  The time required for an examination. As noted above, not all evidence takes the
>
> form of documents and files that can be easily viewed on site.  Analyzing
>
> evidence of how a computer has been used, what it has been used for, and who
>
> has used it requires considerable time, and taking that much time on premises
>
> could be unreasonable. Storage media can store a large volume of information.
>
> Reviewing that information for things described in the warrant can take weeks or

months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

29.  The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint,

12

thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure

pursuant to this warrant.  I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in
   publicly available materials published by device manufacturers, that many
   electronic devices, particularly newer mobile devices and laptops, offer their users
   the ability to unlock the device through biometric features in lieu of a numeric or
   alphanumeric passcode or password. These biometric features include fingerprint
   scanners and facial recognition features. Some devices offer a combination of
   these biometric features, and the user of such devices can select which features
   they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to
   unlock the device through his or her fingerprints. For example, Apple offers a
   feature called "Touch ID," which allows a user to register up to five fingerprints
   that can unlock a device. Once a fingerprint is registered, a user can unlock the
   device by pressing the relevant finger to the device's Touch ID sensor, which is
   found in the round button (often referred to as the "home" button) located at the
   bottom center of the front of the device. The fingerprint sensors found on devices
   produced by other manufacturers have different names but operate similarly to
   Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the
   ability to unlock the device through his or her face. For example, Apple offers a
   facial recognition feature called "Face ID."  During the Face ID registration
   process, the user holds the device in front of his or her face. The device's camera

then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted,

14

inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **PROBABLE CAUSE**

### **Undercover Controlled Buy**

30.     In December 2022,[1] a DEA agent, acting in an undercover (UC) capacity, contacted a subject (hereinafter after referred to as "Supplier 1") to arrange for the purchase of two pounds of methamphetamine. Supplier 1 agreed to sell the UC two pounds of methamphetamine. Supplier 1 told the UC the methamphetamine would be $2,300.00 per pound. The UC agreed to the meet location and price.

31.     On December 8, 2022, the UC was equipped with recording devices and $4,600.00 in official advanced funds (OAF) to purchase methamphetamine. The UC then traveled to a predetermined meeting location where the UC anticipated meeting Supplier 1. Agents established surveillance in the area of the predetermined location.

---

[1] The exact date has not been included in an effort to protect the DEA UC and a DEA CI.

32.     Agents observed supplier 1 and two additional subjects (hereinafter referred to as "Supplier 2" and "Supplier 3") arrive to the predetermined location. The UC met with Supplier 1, Supplier 2, and Supplier 3. The UC handed Supplier 2 the $4,600.00 OAF and observed Supplier 1 and Supplier 2 count the OAF. Before Supplier 1 and Supplier 2 finished counting the OAF, Supplier 2 collected the OAF from Supplier 1 and stated "He's gonna count it anyways." Supplier 2 then walked away from the UC vehicle carrying the $4,600.00 OAF.

33.     Agents observed Supplier 2 appear to be waiting for the arrival of a courier to supply the two pounds of methamphetamine. After several minutes of waiting, agents observed a gold Toyota drive to the meet location. Agents observed the license plate of the Toyota was "933WPY" (Per New Mexico vehicle registration inquiry, the registered owner of the Toyota is Sergio GONZALEZ). Agents observed GONZALEZ driving the Toyota, CHAVEZ was in the front passenger seat, and an unknown female was in the rear passenger seat in the Toyota. Agents observed Supplier 2 enter the Toyota.

34.     While inside the Toyota, agents observed CHAVEZ hand the unknown female what appeared to be a package. The unknown female then handed Supplier 2 what appeared to be a package. After several minutes, agents observed Supplier 2 exit the Toyota and walk back to the UC. While Supplier 2 was walking back to the UC, agents observed what appeared to be a plastic bag containing methamphetamine visible from the pocket of the clothing which Supplier 2 was wearing. Supplier 2 returned to the UC and showed the UC two large plastic bags containing suspected methamphetamine. Supplier 2 handed the UC the two large plastic bags containing methamphetamine. The UC then departed from the meet location in possession of the purchased methamphetamine.

35.     Agents continued surveillance of GONZALEZ, CHAVEZ, the unknown female

and the Toyota. Agents observed GONZALEZ drive from the meet location directly to PREMISES 1, and park near the PREMISES 1. Agents observed GONZALEZ, CHAVEZ, and the unknown female exit the Toyota and enter PREMISES 1.

36.     Following the completion of the deal, agents processed the purchased narcotics and sent the purchased narcotics to the DEA South Central Laboratory for analysis and safekeeping. The laboratory returned the official analysis of the purchased narcotics to be 834.5 grams in weight and chemical analysis positive for methamphetamine.

## Continued Surveillance of PREMISES 1

37. In January 2023, agents conducted surveillance on the PREMISES 1 utilizing an electronic surveillance device. On multiple days, on multiple occasions, agents observed vehicle and foot traffic, in and out of PREMISES 1, consistent with drug trafficking, specifically, the delivery and/or purchase of narcotics in and out of PREMISES 1.

38. On one occasion, agents observed CHAVEZ meet with an unknown male who drove a vehicle to PREMISES 1. CHAVEZ took a bag/package from the trunk of the vehicle, then carried the bag/package into PREMISES 1 as the unknown male drove from PREMISES 1. Agents observed unknown subjects, frequently carrying bags/packages, enter PREMISES 1 and after a short duration of time, depart from PREMISES 1. Agents observed, what appeared to be, bags/packages in varying states- full/heavy, containing some items, and empty. Agents also observed packages which appeared to be large and others which appeared to be small in size. Agents have also observed GONZALEZ at PREMISES 1 with an unknown subject.

39. Agents have observed CHAVEZ carry what appeared to be a black duffle bag, suit case, and other bags, in and out of PREMISES 1. Agents have also observed CHAVEZ carry

what appeared to be two rifles from PREMISES 1 and place them into a vehicle, then drive from PREMISES 1.

40. Based on the foot and vehicle traffic from PREMISES 1 and agent's observation of CHAVEZ's activity connected to PREMISES 1, agents believe that CHAVEZ is actively engaged in illegal drug trafficking associated with PREMISES 1.

41. In January 2023[2], agents conducted surveillance on CHAVEZ. During the surveillance, agents observed that CHAVEZ was in possession of what appeared to be a black handgun. Per NCIC inquiry of CHAVEZ, agents believe CHAVEZ to be a convicted felon. As a convicted felon, it is illegal for CHAVEZ to possess a firearm. CHAVEZ also met with another individual who appeared to be in possession of a handgun with a tan grip.

42. On the same day, agents observed CHAVEZ carry what appeared to be a large bag and a duffle bag from PREMISES 1 to a vehicle and drive from PREMISES 1. Agents then observed CHAVEZ drive to two separate locations to conduct, what appeared to be, a hand-to-hand exchange with an unknown subject and a transfer of a bag from CHAVEZ's vehicle to an unknown subject's vehicle. Agents believe both of these transactions to be CHAVEZ conducting illegal drug trafficking.

## <u>CONCLUSION</u>

44.     Based on my training and experience, the amounts of methamphetamine possessed and/or sold by CHAVEZ, whom agents observed associated with PREMISES 1, are consistent with distribution, not personal use.

---

[2] The exact date has not been included in an effort to protect the DEA UC and a DEA CI

unknown subject's vehicle. Agents believe both of these transactions to be CHAVEZ conducting illegal drug trafficking.

## CONCLUSION

44.     Based on my training and experience, the amounts of methamphetamine possessed and/or sold by CHAVEZ, whom agents observed associated with PREMISES 1, are consistent with distribution, not personal use.

45.     Based on all of the facts related above, there is probable cause to believe that CHAVEZ distributes and possesses with intent to distribute controlled substances, specifically methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

46.     I submit that this affidavit supports probable cause for a warrant to search PREMISES 1 described in Attachment A and seize the items described in Attachment.

47.     AUSA Nora Wilson has reviewed and approved this affidavit.


Respectfully submitted,


_SA Kyle Coffey_____
Kyle Coffey
Special Agent
U.S. Drug Enforcement Administration


Electronically signed and telephonically sworn
On January 13st, 2023

_John F Robbenhaar_____
UNITED STATES MAGISTRATE JUDGE JOHN F. ROBBENHAAR

## ATTACHMENT A

*Property to be searched*

The property to be searched is 300 Moon Street SE, Trailer 3, Albuquerque, New Mexico, 87123, hereinafter "PREMISES 1." PREMISES 1 appears to be a mobile home residence. Around PREMISES 1 appears to be a metal fence and wooden fence. On the exterior of the fence there appears to be the number "3". The exterior walls of PREMISES 1 appear to be white and light brown in color. Attached to the exterior Southwest corner of PREMISES 1 appears to be a number "3" affixed to the exterior wall. There appears to be a gray colored "Direct TV" electronic device attached to the Southwest corner of the roof of PREMISES 1. The primary entrance to PREMISES 1 appears to open to the West. There appears to be an awning/roof over the primary entrance area of the residence. The approximate GPS coordinates are: 35.07011, -106.54115.

The search of the above PREMISES 1 shall include the search of the entire residence, all attached and unattached garages and storage areas/containers/sheds (including mailboxes and trash cans) on PREMISES 1, and all persons located in PREMISES 1 in or on which the items to be seized could be concealed. The search shall also include all vehicles parked at, or in front of, PREMISES 1 that have an apparent connection to PREMISES 1 and/or CHAVEZ. Connection to the vehicle may be established by evidence that anyone residing at PREMISES 1 and/or CHAVEZ may own, operate, and/or have access to any vehicle parked at or in front of PREMISES 1. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

A photograph of PREMISES 1 is included below:



## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841(a)(1), that being distribution and possession with intent to distribute a controlled substance, those violations involving CHAVEZ, including:

1. Controlled substances, including methamphetamine, heroin, fentanyl, cocaine, and marijuana.

2. Drug paraphernalia, including scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8.  Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including utility bills, cancelled checks, or envelopes and deeds or leases.

9.  Indications of ownership or control over any vehicles located at the place to be searched, including titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

2

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

If any electronic devices are seized during the execution of the search of PREMISES 1 described in Attachment A, law enforcement personnel are authorized to press or swipe the fingers (including thumbs) of CHAVEZ or any resident of PREMISES 1 to the fingerprint scanner of any such electronic devices, and to hold such devices in front of CHAVEZ's face or the face of any resident of PREMISES 1 to activate the facial recognition or iris recognition feature for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

3